**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

CLAUDETTE A. EASLEY,    :

   Plaintiff,       :

vs.           :  CA 11-0072-C

MICHAEL J. ASTRUE,     :
Commissioner of Social Security,

            :

   Defendant.


**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 19 ("In accordance with provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 20 (endorsed order of reference).) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of the parties at

1

the November 17, 2011 hearing before the Magistrate Judge, it is determined that the Commissioner's decision denying plaintiff benefits should be affirmed.[1]

Plaintiff alleges disability due to general pain syndrome and mental impairments, including depression, post-traumatic stress disorder, and anxiety. The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.**
>
> **2.     The claimant has engaged in a form of substantial gainful activity since August 31, 2005, the alleged onset date, to wit she testified that she has custody and control of her two children, ages 12 and 7, who live with her.  (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**
>
> The record indicates that the claimant has performed the job of child sitter for children in her own family on a regular [and] sustained basis. She has sole custody of her children who live with her. The job of a child sitter is a very time-consuming and a very difficult job, one that requires substantial and significant physical and mental abilities and activities. It is one that is customarily performed for pay or profit. It therefore constitutes substantial gainful activity whether or not a profit is thereby realized. 20 CFR 404.1572, 416.972.
>
> **3.     The claimant has the following severe impairments: major depressive disorder, general pain syndrome with myalgias and arthralgias, sinus tachycardia, posttraumatic stress disorder, generalized anxiety disorder, adjustment disorder with mixed features, and migraine headaches (20 CFR 404.1520(c) and 416.920(c)).**

.     .     .

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 19 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

The claimant was referred to Selma Family Medicine Center on March 5, 2004, for an independent evaluation. The claimant reported "I need rape counseling". She reported that she was raped in 1995 while living in New York. Department of Human Resources became involved with her after she "spanked [her] 11 year old daughter." Her children were taken away from her on January 8, 2004. She has 3 children who are 11, 7, and 2 years old. She has been separated from her husband for about a year as he apparently was going out with other women. This was after a 4 year marriage. She admitted that her mood had been "stressed out" over her children being out of her home even though they are living with her mother.

During the mental status examination, the claimant was polite and composed. Her thoughts and conversations were logical. Associations were intact. Her affect was somewhat flat but appropriate, not labile. No confusion was noted. She complained of mild anxiety and was restless. No tremors were noted. She maintained fairly good eye contact throughout. Her mood was moderately depressed. She had had problems with sleep disturbance, appetite and energy problems. She had occasional crying spells. There was no evidence of any suicidal or homicidal thoughts. There were no hallucinations, delusions, or persecutory type fears. No phobias were noted. She still obsesses about the rape and is quite obsessed about getting her children back. She was alert. Her insight and judgment were considered fair for working (sic) financial type decisions.

Dr. Donald W. Blanton diagnosed adjustment disorder (losing children, divorce) with anxiety and depression, and post traumatic stress disorder with depression. Dr. Blanton assigned a global assessment of functioning (GAF) score of 60 (Exhibit B1F). According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 51 and 60 represents: "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

The claimant presented to Dr. Maurice Joseph Fitz-Gerald's office on July 19, 2006, complaining of pain in her right arm and shoulder for four days. She was assessed as having probable nerve impingement. She was given an injection of Toradol and placed on a muscle relaxer and an anti-inflammatory. She was set up for physical therapy (Exhibit B5F).

The claimant presented to Neurology Consultants of Central Alabama on August 24, 2006, with chief complaint of pain in the right side of the head

and right upper and lower extremities of 1½ months duration. She was taking Ibuprophen and a muscle relaxant. Dr. Walid W. Freij assessed pain in the head, neck, and right upper extremity-all suggest[ed] the possibility of cervical radiculopathy. The pain radiating to the right lower extremity [wa]s peculiar. It can occur with spinal cord injuries or pathology such as a spinal cord compression. No sensory level, however, was found on her. There was a positive Hoffman's sign, but keep in mind that 10% of the normal population will have a Hoffman's sign present (Exhibit B4F).

The claimant presented to Neurology Consultants of Central Alabama on August 28, 2006, with complaints of bilateral arm pain with numbness and tingling. There was right hand weakness versus the left and there was also right shoulder pain. She complained of rare right sided hip pain with numbness, tingling in the right foot. She denied left leg involvement. She was taking Naproxen and Celebrex. An MRI of the cervical spine performed and reviewed on August 28, 2006, revealed straightening of the cervical lordosis but no neuron-compressive herniated nucleus pulposus (Exhibit B4F).

The claimant presented to Dr. Fitz-Gerald's office on September 8, 2006, reporting arm and shoulder pain. She noted generalized myalgias. She also complained of pain with deep breathing. Chest x-ray showed no acute infiltrates, pneumothorax or cardiomegaly. Dr. Fitz-Gerald assessed chronic body aches/joint pains with previous negative work up for Lupus or Autoimmune Diseases. The claimant had CBC returned with essentially normal findings. Sedimentation rate was minimally elevated (Exhibit B5F).

The claimant presented to UAB Rheumatology as a new patient on November 7, 2006. The claimant's chief complaint was diffuse arthralgias. Her medical history was significant for depression and bilateral carpal tunnel syndrome. She was status post right knee arthroscopy in 1998. On examination, the claimant was well appearing, in no acute distress. Bilateral hands, wrists, elbows, and shoulders without synovitis and full range of motion and normal strength. Neck with mild restriction in lateral rotation with flexion [and] extension well preserved. There was tenderness to deep palpation around the paracervical musculature. Bilateral hips with negative Patrick's testing, negative straight leg raise. Bilateral knees with mild crepitus, right greater than left without effusion, laxity or warmth. Bilateral ankles and feet without active synovitis with full range of motion and normal strength. Labs obtained from an outside institution dated September 8, 2006, revealed negative ANA and normal

CBC. Nerve conduction studies revealed mild bilateral carpal tunnel syndrome without peripheral neuropathy. MRI report, cervical spine dated August 28, 2006, revealed straightening of the cervical lordosis but no neurocompressive herniated nucleus pulposus. Dr. Anthony M. Turkiewicz's suspicion was an inflammatory rheumatic condition or an ANA associated connective tissue disease (Exhibit B7F).

An x-ray of the cervical spine performed and reviewed on November 7, 2006, was normal (Exhibit B7F).

X-rays of the left and right knees performed and reviewed on November 7, 2006, were radiographically normal (Exhibit B7F).

X-rays of the right foot performed and reviewed on November 7, 2006, were radiographically normal (Exhibit B7F).

X-rays of the left hand and the right hand performed and reviewed on November 7, 2006, were radiographically normal (Exhibit B7F).

Dr. Earle Shugerman completed a physical residual functional capacity assessment on November 28, 2006. Dr. Shugerman indicated that the claimant's primary diagnosis was mild carpal tunnel syndrome bilaterally. Dr. Shugerman indicated that the claimant could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. The claimant could stand and/or walk about 6 hours in an 8 hour workday and sit about 6 hours in an 8 hour workday. The claimant's ability to push and/or pull was unlimited. The claimant should avoid climbing ladders, ropes, and scaffolds. The claimant could frequently climb ramps and stairs. The claimant could frequently balance, stoop, kneel, crouch and crawl. The claimant should avoid concentrated exposure to vibration. The claimant should avoid all exposure to hazardous machinery and heights (Exhibit B8F). Dr. Shugerman's assessment allows for greater functional capacity than we find, but it otherwise fully supports the decision reached.

Dr. Nina E. Tocci performed a consultative psychological evaluation on December 19, 2006. When asked her reason for applying for disability, the claimant stated, "I like being to myself I don't like being around other people, stay to myself and I have joint, real bad pain in my muscles, back, and migraine head aches I'm sorry if I'm talking loud right now my head is hurting m[e] real bad". The claimant was raped at gunpoint (1995) and [she] sought treatment two years after the incident. She has had treatment at the mental health center (1997 to present). She attends counseling once per month and is prescribed Zoloft, Lunesta, and Klonopin.

During the mental status evaluation, she had good eye contact, sad facial expressions and a cooperative attitude toward the examiner. Her affect was appropriate, normal and stable. She described her mood as "down and depressed and why I don't even know". She was oriented to time, place, person, and situation. She demonstrated fair attention and scattered concentration. She was able to identify the current President, the immediate past President of the United States, and the Governor of Alabama. She demonstrated a fair fund of information and comprehension. She demonstrated thought content appropriate to mood and circumstances and a logical thought organization. She denied experiencing homicidal ideations, intent, gestures, and delusions. When asked about suicidal ideations, she stated "not lately I haven't [ideated about suicide] (Q) like in the last 6 months I hadn't". She reported that she "took some pills but they ain't do nothing but make me sleepy" "2 or 3 years ago" and "I have had a gun fixing to shoot myself but somebody came in and stopped me" "2002 or 3". She sees "a man sometimes I don't know if that comes from being raped but I see him and I see angels and a little boy I always see this little boy". She believes that "somebody is always doing something plotting and scheming, trying to get me, talking about me. I don't like being like that either". She has a variable appetite, crying spells several times per month, and difficulty staying asleep and going to sleep. She prefers to isolate from others and is distrustful of the motive of others.

During the day, the claimant watches television and rests. She cares for her children and performs household chores with assistance from her daughter (age 10). Interestingly and significantly, she has apparently done so successfully despite the alleged side effect that she told us-but not apparently DHR-that her medications make her sleepy . . . . She is able to perform activities of daily living without assistance. She attends church "sometimes", drives, and does not have friends. She does not trust others.

Dr. Tocci diagnosed major depressive disorder, recurrent. Dr. Tocci assigned a global assessment of functioning (GAF) score of 50 (Exhibit B9F). According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF of between 41 and 50 represents serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Dr. Tocci opined that the claimant was capable of performing simple tasks in a timely manner. Dr. Tocci opined that the claimant's prognosis was good (Exhibit B9F).

Dr. Robert Estock completed a mental residual functional capacity assessment on December 28, 2006. Dr. Estock indicated that the claimant was moderately limited in the following areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods and the ability to interact appropriately with the general public. Dr. Estock elaborated on the preceding capacities by explaining his summary conclusions as follows: The claimant is able to remember locations and work like procedures. The claimant is able to understand, remember, and carry out short simple instructions. The claimant may have moderate difficulty handling more detailed instructions but likely can handle even these if they are broken down into simple 1-2 step tasks and she is given adequate rehearsal. The claimant is able to maintain attention sufficiently to complete simple 1-2 step tasks for periods of up to 2 hours without special supervision or extra rest periods (Exhibit B10F).

Dr. Estock also completed a psychiatric review technique form on December 28, 2006, indicating that a medically determinable impairment (major depressive disorder-recurrent, moderate-Adjustment Disorder with anxiety) was present but the impairment did not precisely satisfy the diagnostic criteria of Listing 12.04 Anxiety Disorders. Dr. Estock indicated that a medically determinable impairment (generalized anxiety disorder-post traumatic stress disorder with depression) was present but the impairment did not precisely satisfy the diagnostic criteria of Listing 12.06 Anxiety Related Disorders. Dr. Estock indicated that the claimant had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation, each of extended duration. Dr. Estock indicated that the evidence did not establish the presence of the "C" criteria.

The claimant presented to Dr. Erik P. Lessman's office on January 15, 2007, reporting that she was having headaches. She was assessed as having migraine headaches with subsequent tension headache. She was prescribed Imitrex and Flexeril (Exhibit B11F).

The claimant presented to Neurology Consultants of Central Alabama on January 29, 2007, reporting that her symptoms of carpal tunnel were better. The pain in the right hand had improved. She had been having one

or two headaches a week. She had noticed that eating chocolate exacerbated or triggered her headache. She was assessed as having carpal tunnel syndrome and migraine headaches. The claimant was tested for Lupus and all of her tests were negative (Exhibit B12F).

The claimant presented to Dr. Fitz-Gerald's office on February 15, 2007, complaining of lower back pain that goes down her right leg. She was assessed as having lumbar sacral derangement or strain. She was given Decadron 8 mgs. IM. She was placed on a short burst of steroids and Lortab for pain. The claimant reported on March 15, 2007, for an ultrasound of her abdomen. She was assessed as having endometriosis and duodenal ulcer disease. She was placed on Protonix, Doxepin, Flagyl and Quinolone. The claimant returned on April 5, 2007, hurting in both lower quadrants. She was assessed as having endometriosis and peritonitis. She was placed on Flagyl and Quinolone (Exhibit B14F).

The claimant was hospitalized at Bryan W. Whitfield Memorial Hospital from May 10, 2007, to May 11, 2007. She presented with essential hypertension, chest pain and syncope. She was placed on Coreg, Protonix, and Hydrochlorothiazide. She responded nicely and a cardiac workup was essentially negative (Exhibits B13 and B15F).

A chest x-ray performed and reviewed on May 10, 2007, revealed no active disease (Exhibit B15F).

Records from Dr. Fitz-Gerald show that the claimant received general medical treatment during the period May 10, 2007, to July 10, 2007. She was assessed as having chest pain, tachycardia, near syncope, palpitations, lymphadenopathy, history of hypertension, dysfunctional uterine bleeding, and low back strain (Exhibit B16F).

The claimant presented to Dr. Fitz-Gerald's office on August 7, 2007. The chief complaint was: States she has chest pains 1 week ago and went to e.r. – was told everything was ok but she continues to have chest pain, esp. on exertion. On examination, the claimant was in no acute distress. Dr. Fitz-Gerald's plan was to try some Amniodarone. She had been worked up by a cardiologist and she has a perfectly normal heart. We exercised her and she was perfectly fine (Exhibit B17F).

The claimant presented to Dr. Fitz-Gerald's office on January 25, 2008, wanting to get pregnant. An ultrasound was obtained. There were no fibroids noted. She was placed on Glucophage and Clomid (Exhibit B19F).

The claimant presented to the emergency room at Southwest Alabama Medical Center on March 4, 2008, reporting vaginal spotting. She thought she might be pregnant. Urine pregnancy test performed on March 4, 2008 was negative (Exhibit B18F).

At the hearing held on February 5, 2009, Dr. Anderson reviewed the documentary evidence noting that this 37 year old lady has multiple medical records for generalized pain syndrome. She has complaints of pain in most of her body systems. The evaluations for her orthopedic situations, she has a normal work up as far as that is concerned. She has complaints of hand pain which she had evaluations for carpal tunnel syndrome. I believe her nerve conduction studies are normal although I am not a neurophysiologist interpreter. She has had no specific treatment for that. She has had pelvic pain evaluated, spinal pain, chest pain and work-up, which included cardiac work up with a normal echocardiogram in October 2007. She has sinus tachycardia which has been treated symptomatically. She has hypertension. She has significant psychological problems which I believe would lead to the diagnosis of psychological disorder affecting physical well-being. All of her physical complaints are treated symptomatically and intermittently by multiple physicians. The records as they are in my view would not meet or equal the Secretary's (sic) Listings for disability. The amount of pathology based upon her records in my view would limit her to light work with a sit/stand option since her alleged onset date. Her pain is intermittent and moderate although she said today that it is constant.

At the hearing held on February 5, 2009, Dr. McKeown reviewed the documentary evidence noting that we have a 38 year old individual with a high school education. The record would indicate that she was seen in 2004 by a counselor associated with post traumatic stress disorder related to a 1995 rape. The consideration from Dr. Blanton was an adjustment disorder with mixed features, anxiety and depression, and post traumatic stress disorder. The mental health set of records from April 2006 through October 2006 at West Alabama Mental Health indicates a major depressive disorder and a generalized anxiety disorder. Treatment started out with Prozac and was changed to Zoloft, and Klonopin. The consultative examination was done by Nina Tocci in December 2006. She considered a major depressive disorder and also considered that the claimant was functioning at borderline intellectual functioning. There is information from Dr. Lessman from January 2007 that indicates her primary complaints were headaches. He indicates that there was no evidence of anxiety or depression and that there were also no mental disabilities at that time but he did report that she was taking Cymbalta, Lyrica and

Soma. There is no indication of any mental health treatment other than medications since October 2006 but she is taking medication for depression and also anxiety. From the department's perspective, the evaluation would be under 12.04. The indications in the record would be for either a major depressive disorder and then some conflict since she left mental health for two physicians practicing in non-psychiatric specialties, one saying she has a major depressive disorder and one saying she has none but at the very least consideration either as major depressive disorder with marked somatic pre-occupation or a depressive disorder, NOS which perhaps would be an outgrowth of her pre-occupation with physical problems. There is in the record an indication of a generalized anxiety disorder that could be considered under 12.06. Again, the record would reflect no more treatment other than medication for that particular issue. The mental health issues in the absence of any severity other than the need to continue some medication over the past two years would not provide a basis for a severity level that would meet or equal the Secretary's (sic) Listing. The B criteria, would indicate basically no impairment of activities of daily living, mild to moderate impairment of social functioning, mild impairment of concentration, persistence, and pace-could be considered moderate at times when she is experiencing headaches[-] and no reported episodes of decompensation in work or a work like setting.

.     .     .

Dr. McKeown . . . [testified that] GAF scores are basically a snapshot [in time] and the presentation usually given during a consultative examination focuses on virtually all the limitations an individual has. In her presentation, depression, chronic pain, and the like, and a GAF score of 50 would not be unusual, but again I have yet to be able to determine any way that a GAF score relates to an individual's ability to function occupationally. . . . On a particular point in time and based on the presentation provided to Dr. Tocci that would be reasonable, but Dr. Tocci's report did not suggest a disabling level of function.

.     .     .

[Dr. McKeown further testified that] from a clinical perspective a GAF score means virtually very little.

.     .     .

I find that Dr. Tocci's report is fully credible in all respects but that as Dr. McKeown stated, the GAF score is merely a snapshot in time, accurate for the day of the exam only, but certainly not for any continuous period lasting or expected to last for one continuous year or more. We also note that Dr. Blanton had attained a higher score.

**4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).**

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has no restriction. In social functioning, the claimant has mild to moderate difficulties. With regard to concentration, persistence, or pace, the claimant has mild to moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental

impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

**5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, with a sit/stand option, with the following limitations/considerations: She experiences intermittent moderate pain. She has moderate limitations in the ability to understand, remember, and carry out detailed instructions. She has moderate limitations in the ability to maintain attention and concentration for extended periods. She has moderate limitations in the ability to interact appropriately with the general public. She has moderate limitations in the ability to deal with co-workers and the general public. She is able to remember locations and work like procedures. She is able to understand, remember, and carry out short simple instructions. She may have moderate difficulty handling more detailed instructions but likely can handle even these if they are broken down into simple 1-2 step tasks and she is given adequate rehearsal. She is able to maintain attention sufficiently to complete simple 1-2 step tasks for periods of up to 2 hours without special supervision or extra work periods.**

.      .      .

I [] fully accept the essence of the medical experts' testimony. . . . After considering all the evidence of record as to this claimant's combination of impairments, the Administrative Law Judge accepts the testimony of our medical experts because the Administrative Law Judge finds that the testimony is credible, is consistent with the medical record, makes sense and the Administrative Law Judge, as an independent finder of facts, believes that testimony to be true, accurate and correct. . . .

As for opinion evidence, Dr. Tocci's GAF score of 50 is only a snapshot of the claimant's presentation on the day of the consultative examination. The doctor's opinion in that regard only is without sustained support and contrasts with the other evidence of record, which renders it less persuasive. I accept the testimony of our medical experts because I find that the testimony is credible, in consistent with the medical record, makes

sense and as an independent finder of facts, believe the testimony to be true, accurate and correct.

The record indicates that the claimant has performed the job of child sitter for children in her own family on a regular sustained basis. She has sole custody of the children and receives ADC for them. The job of child sitter is a very time-consuming and a very difficult job, one that requires substantial and significant physical and mental abilities and activities. It is one that is customarily performed for pay or profit. It therefore constitutes substantial gainful activity (SGA) and certainly establishes the ability to perform SGA, whether or not profit is thereby realized. 20 CFR 404.1572, 416.972.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

.        .        .

**7.      The claimant was born on February 3, 1971 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).**

**8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.      Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of

either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would have be able to perform the requirements of representative occupations such as Food Assembler (Light, Unskilled) with 11,000 jobs regionally and 250,000 jobs nationally, Inspector (Light, Unskilled) with 1,300 jobs regionally and 650,000 jobs nationally, and Packer (Light, Unskilled) with 2,600 jobs regionally and 205,000 jobs nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 12, 13-19, 19, 20, 20-21, 21, 22 & 22-23 .)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

### DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005.  Once the claimant meets this burden, as here,[2] it becomes the Commissioner's burden to prove that the claimant is capable, given her age, education and work history, of engaging in another kind of substantial gainful employment which exists in the national economy.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that, within the framework of the grids, she can perform those light jobs (with a sit/stand option) identified by the vocational

---

[2]      While the ALJ, several times in his decision, mistakenly noted that plaintiff was engaged in substantial gainful activity as a child sitter for her own children (*compare* Tr. 12 (step 1) *with* Tr. 22 (step 5)), these errors were harmless in light of the fact that the ALJ specifically proceeded to the fifth step of the sequential evaluation process, found that plaintiff was quite limited with respect to her residual functional capacity, and, most importantly, relied upon the testimony of a vocational expert ("VE") to identify other work in the national economy which she is capable of performing, none of which is work as a child sitter (*see* Tr. 23).  *Cf. Farrington v. Astrue,* 2010 WL 1252684, *4 (M.D. Fla. Mar. 29, 2010) ("[A] continued analysis in the sequential step evaluation process can infer failure to articulate a finding at an earlier step was harmless error.").

expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3]

In this case, the plaintiff contends that the ALJ made the following errors: (1) he erred as a matter of law in finding she engaged in substantial gainful activity since the alleged onset date; (2) his limitation of a sit/stand option without further definition is not based on substantial evidence; and (3) he erred in relying on the opinions of reviewing physicians. (*See* Doc. 13.)

It is clear in this circuit that the Commissioner of Social Security must develop "a full and fair record regarding the vocational opportunities available to a claimant." *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989) (citation omitted). The Commissioner must articulate specific jobs that the claimant can perform given her age, education and work history, if any, "and this finding must be supported by substantial evidence, not mere intuition or conjecture." *See id.* (citation omitted). Stated differently, the burden is on the Commissioner at the fifth step of the sequential evaluation process

_____

[3]        This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

to establish capacity to perform other work and thereby to establish the claimant's

residual functional capacity. *See Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

In this case, plaintiff's primary argument (and the sole argument urged at length

during oral argument on November 17, 2011)[4] is that the ALJ's finding that she can

perform light work with a sit/stand option is not supported by substantial evidence

because the ALJ erred in failing to set out all of her functional capabilities in a function

---

[4]        Because the plaintiff did not make any mention of her third assignment of error (*see* Doc. 13, at 8-10) during oral argument, the undersigned would merely point out the Court's disagreement with the plaintiff's argument that the ALJ erred in relying on agency opinions and physician testimony in this case. *Cf. Pettus v. Astrue,* 226 Fed.Appx. 946 (11th Cir. Apr. 5, 2007) (affirming the denial of benefits in a case in which the ALJ accorded great weight to the testimony of a medical expert). While the undersigned certainly recognizes that the opinions of physicians who merely review the record are entitled to less weight than those of examining physicians, *see, e.g., Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990), the Court finds that the ALJ correctly assigned little weight to Dr. Tocci's indication that plaintiff's GAF score of 50 was for both the current year (2006) and past year (*compare* Tr. 278 *with* Tr. 20 ("I find that Dr. Tocci's report is fully credible in all respects but that as Dr. McKeown stated, the GAF score is merely a snapshot in time, accurate for the day of her exam only, but certainly not for any continuous period lasting or expected to last for one continuous year or more."), not only because Dr. Tocci's indication is inconsistent with her observation that plaintiff "is capable of performing simple tasks in a timely manner[,]" (Tr. 278-279) but, more importantly, because Dr. McKeown's GAF testimony (Tr. 69 ("[A] GAF score is basically a snapshot[.]"); *see also* Tr. 70 ("From a clinical perspective, a GAF score means virtually very little.")) is entirely consistent with pertinent case law, *see, e.g., Green v. Astrue,* 2011 WL 1770262, *18 (D. S.C. May 9, 2011) ("A GAF score may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given. Without additional context, a GAF score is not meaningful."); *Flores v. Astrue*, 2011 WL 1334419, *5 (C.D. Cal. Apr. 6, 2011) ("The Social Security regulations do not require an ALJ to take the GAF score into account in determining the extent of an individual's disability; while the score may help the ALJ assess the claimant's disability, it is not essential and the ALJ's failure to rely on the GAF does not constitute an improper application of law."); *Arnold v. Astrue*, 2010 WL 5812957, *8 (S.D. Ohio Oct. 7, 2010) ("[A] GAF score merely represents a 'snapshot' of a person's 'overall psychological functioning' at or near the time of the evaluation. . . . As such, a GAF assessment is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis."), *report & recommendation adopted*, 2011 WL 597064 (S.D. Ohio Feb. 10, 2011). Accordingly, the undersigned finds no error in the ALJ according little weight to the GAF aspect of Dr. Tocci's report and, instead, relying on medical expert testimony in this regard.

by function format as required by SSRs 83-10, 83-12 and 96-8p. Plaintiff correctly observes that SSR 83-10 provides that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work[5] requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday[,]" and, further, that many light jobs require use of the arms and hands to grasp and to hold and turn objects; that SSR 83-12 specifically recognizes that "[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will[;]" and that SSR 96-8p specifically provides that at step 5 of the sequential evaluation process, it is necessary for the adjudicator to assess the claimant's capacity to perform the exertional and nonexertional functions required by a certain level of work before determining whether the individual is capable of doing such work. While the undersigned need agree with plaintiff that the ALJ did not decide this case in lock step with the foregoing social security rulings (from an exertional standpoint), particularly SSR 96-8p's function-by-function analysis requirement,[6] since the record in this case supports the ALJ's implicit determination that plaintiff can perform the

---

[5]     *See, e.g.,* 20 C.F.R. § 404.1567(b) (2011) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").

[6]     Plaintiff makes no argument, and indeed she can make no argument, that the ALJ failed to assess her mental capabilities on a function-by-function basis. The ALJ's noted mental limitations (Tr. 21) are supported by substantial evidence (*see, e.g.,* Tr. 278-282).

requirements of light work with a sit/stand option, the undersigned finds any technical transgression of SSR 96-8p harmless.

In this regard, the undersigned would note that no physician who treated or examined plaintiff indicated that she would be unable to perform the lifting or carrying requirements of light work or otherwise be unable to perform necessary manipulative functions with her arms or hands. Indeed, the only evidence in the record regarding plaintiff's ability to perform these specific functions is the physical residual functional capacity assessment completed by a reviewing, non-examining physician, Dr. Earle Shugerman, who determined that plaintiff could frequently lift and/or carry up to 25 pounds and has an unlimited ability to handle and finger objects. (*See* Tr. 267-274.) Even more important than Shugerman's assessment is the testimony of Dr. James N. Anderson at plaintiff's hearing. (*See* Tr. 63-65.) Dr. Anderson specifically recognized plaintiff's various physical impairments, that is, generalized pain syndrome (making specific mention of her hands) and tachycardia (*id*. at 63-64), and testified that the "amount of pathology based upon her records" would "limit her to light work with a sit/stand option[.]" (*Id*. at 64.) This testimony by a medical expert reviewing the entirety of medical evidence constitutes, in this Court's opinion, an implicit determination that Easley can perform the exertional functions/requirements of light work. Therefore, the ALJ did not err when he simply engrafted Dr. Anderson's testimony into his Finding No. 5 instead of explicitly setting forth the exertional functions plaintiff is capable of

performing on a function-by-function basis.[7] Moreover, given the vocational expert's specific identification of light jobs in significant numbers in the national economy[8] that allow for sit/stand option, that is, work as a production assembler, inspectors, and packers (Tr. 73-74), *compare Williams v. Barnhart*, 140 Fed.Appx. 932, 937 (11th Cir. Aug. 15, 2005) ("Although the ALJ failed to specify the frequency that Williams needed to change his sit/stand position, the reasonable implication of the ALJ's description was that the sit/stand option would be at Williams's own volition.") *with Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158 & 1161 (11th Cir. 2004) (affirming Commissioner's decision denying benefits in a case in which the ALJ determined that the claimant "retained the RFC to perform 'a significant range of light work,' including work that involved 'simple, repetitive, routine, low stress, safe, light work in clean surroundings, with a sit/stand option, and no overhead reaching.'"), and his further testimony that such work would not be adversely impacted by Dr. Shugerman's noted

---

[7]     This Court may well have reached a different conclusion had a medical expert not testified in this case or had issue been taken with the medical expert's testimony at the hearing. However, a medical expert did testify and by so testifying—uncontested as it was (*see* Tr. 65 (plaintiff's counsel had no questions of Dr. Anderson during the hearing))—the ALJ sufficiently established, based upon the medical evidence of record, that plaintiff can perform the exertional requirements of light work with a sit/stand option.

[8]     *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1989) (174 jobs in the area claimant resided was significant).

reaching limitations (Tr. 74),[9] the Court finds the ALJ's fifth-step denial of benefits supported by substantial evidence.[10]

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 8th day of December, 2011.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[9]     The undersigned would note, again, that plaintiff's attorney at the administrative hearing did not take issue with the vocational expert's testimony vis-à-vis plaintiff's ability to perform the exertional requirements of the jobs identified at the hearing. (*See* Tr. 74-75.)

[10]     Plaintiff has never offered any evidence that she could not perform the unskilled light jobs identified by the VE based on her ability to sit or stand for any period or based upon any other functional requirements of those jobs. "This failure prohibits [Easley] from establishing [her] burden of [her] inability to perform the identified jobs." *Williams, supra,* 140 Fed.Appx. at 937, citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).